783 N.E.2d 673 (2003)
336 Ill. App.3d 325
270 Ill.Dec. 711
In re GUARDIANSHIP OF ALEXANDER O., a Minor (Mary F., Petitioner-Appellant,
v.
Seth O., Respondent-Appellee).
No. 2-02-0566.
Appellate Court of Illinois, Second District.
January 22, 2003.
*675 Richard M. Butera, Butera Law Offices, P.C., Rockford, for Mary F.
John J. Newton, Rockford, for Seth Thomas O.
Justice BOWMAN delivered the opinion of the court:
Mary F. petitioned the circuit court of Winnebago County for custody of her grandson, Alexander O. Seth O., Alexander's father, contested the petition. The trial court awarded custody of Alexander to Seth. Mary appeals, arguing that (1) the trial court applied an incorrect standard in its custody determination, and (2) the court's decision to grant custody to Seth was not in Alexander's best interest.
Mary is Alexander's maternal grandmother. Alexander and his mother, Patricia F., lived with Mary for several years prior to Patricia's death in October 2000. Patricia had sole custody of Alexander and had never been married to Seth. Following Patricia's death, Mary filed a petition for permanent guardianship and custody of Alexander and his younger half-sister, Mia Q., who is not involved in this appeal. Seth moved to dismiss Mary's petition on the ground that she lacked standing.
Mary then filed an amended petition for guardianship and custody, containing one count brought under the Probate Act of 1975 (Probate Act) (755 ILCS 5/11-1 et seq. (West 2000)) and a second count brought under section 601 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601 (West 2000)). She subsequently withdrew count I of the amended petition and proceeded solely under the Act. Following a hearing, the court ruled that Mary had standing to seek custody of Alexander and denied Seth's motion to dismiss. Seth filed a petition for leave to appeal pursuant to Supreme Court Rule 306(a)(5) (166 Ill.2d R. 306(a)(5)), which this court denied.
On February 11, 2002, the court conducted a hearing to determine Alexander's best interests. At the time of the hearing, Alexander was nine years old. He resided with Mary and Mia, who was almost two years old at the time. Alexander's mother, Patricia, committed suicide on October 29, 2000. Mary testified that Alexander had lived with her continuously for the past three years and off and on prior to that time.
After Alexander was born, he, Patricia, and Seth lived with Mary for approximately four months. Then they went to live with other family or friends. After a few months, Patricia and Seth broke up, and Patricia and Alexander moved back in with Mary. They lived with her for a few years. During that time, Seth visited Alexander about twice a month. Mary did not receive any financial contribution from Seth during the time Patricia and Alexander were living with her.
Mary worked during the day and would take care of Alexander in the evenings when Patricia was at work. Patricia had a drinking problem and was unable to keep a steady job. After living with Mary for two years, Patricia and Alexander moved in with Patricia's boyfriend. They broke up after one year because of Patricia's drinking problem. Patricia and Alexander then lived with a friend of Patricia's for about one year, and then with Patricia's sister Suzanne. In 1997, Patricia and Alexander moved back in with Mary and stayed with her from then on. Mary did not know how much contact Seth had with Alexander during the time Alexander did not live with her.
When Patricia and Alexander moved in with Mary in 1997, Patricia had serious drinking and drug problems. Patricia worked as a bartender sometimes but often *676 would get fired because she would not show up for work. Mary paid all of the household expenses including food and utilities. She also bought most of Alexander's clothes.
Seth moved to Georgia in 1998. Occasionally, he sent money orders to Mary. Mary estimated that she received about $600 from him per year for two or three years. Before Seth moved to Georgia, he saw Alexander two or three times a month, sometimes overnight. After the move, Seth talked to Alexander on the telephone once or twice a week. In 1998, Alexander stayed with Seth for the month of August and visited him over Thanksgiving. Seth also spent time with Alexander that Christmas. In 1999 and 2000, Alexander stayed with Seth in Georgia for six weeks each summer and also saw Seth at Christmas.
Since Alexander has been in school, Mary has been responsible for helping him with homework and following his progress. She has also taken over responsibility for communicating with Alexander's teachers since her daughter's death. Alexander is good at math but has some difficulty with reading. He is enrolled in an after-school program in which he gets help with his homework and participates in cultural activities. He is in grief counseling both on an individual basis at school and on a group basis. Mary enrolled him in a camp for children who recently lost a close family member. Alexander is involved in many activities, including basketball and karate.
Mary testified that many of her family members live in the Rockford area, including her two daughters. Her daughter Suzanne lives two houses away from her. Alexander goes to Suzanne's house every day to get ready for school because Mary has to leave early for work. Seth's brother and his family occasionally come to visit Alexander. Mary testified that Alexander has a very loving relationship with his sister, Mia.
Mary expressed her belief that it was in Alexander's best interest to remain in her home. She stated that she has no health problems that would prevent her from caring for Alexander.
Cynthia H., Mary's daughter, testified that she sees Mary and Alexander about once a week. She stated that Alexander and Mary have a loving relationship. On cross-examination, Cynthia testified that she has not seen Alexander interact with his father in Georgia but she knows that he likes his father.
Mary's daughter Suzanne F. testified that Alexander comes to her house every day to get ready for school and she takes him to school. Alexander has a good relationship with Suzanne's daughter, Nicole.
Seth testified that he has lived in Manchester, Georgia, for the past 3½ years. He works as a superintendent for a construction company. He is financially able to support Alexander.
When Alexander comes to stay with Seth they go swimming, fishing and camping. Seth has also taken Alexander to Florida to visit his uncles. Seth's father and grandfather live in Manchester, which has a population of 15,000. There is an elementary school that Alexander would attend if he lived with Seth. He would go to his grandfather's house after school until Seth finished work at 5 p.m. Seth testified that Alexander has a friend in Manchester who lives next door to Seth's grandfather.
Seth testified that when Alexander is with him he tries to spend at least one hour per day working on Alexander's reading skills. He would help Alexander with his homework if Alexander lived with him.
*677 Seth further testified that he sent money to both Patricia and Mary for Alexander's support. After Patricia died, he thought it best for Alexander to finish the school year in Rockford. He intended for Alexander to live with him when the school year ended. Seth offered to pay support to Mary after Patricia died, but Mary never accepted his offer.
Seth testified that he has a great relationship with Alexander and loves him very much. He believes it is in Alexander's best interest to live with him because he is able to do more activities with Alexander than Mary. Seth also believes the schools in Georgia are better than Rockford's schools.
On cross-examination, Seth testified that his gross monthly pay is $2,500. When he first moved to Georgia he earned a little bit less because he was not a supervisor. He rents a two-bedroom home, where he lives with his fiancee, Denise. Seth stated that Alexander has a loving relationship with Denise.
At the close of the evidence, Roseann Cannariato, the appointed child representative, advised the court that it was in Alexander's best interest to remain with Mary. Cannariato's recommendation was based upon Alexander's expressed desire to live with Mary and his sister, his strong relationships with them, and the fact that Mary has been his primary caretaker since 1997. Cannariato noted that Alexander has made significant improvement at school due to Mary's involvement.
In making its ruling, the court acknowledged that Mary has been the stabilizing force in Alexander's life and has provided for his needs for many years. The court also noted that Seth has always maintained a relationship with Alexander. Relying on In re Estate of Webb, 286 Ill.App.3d 99, 221 Ill.Dec. 285, 675 N.E.2d 192 (1996), the court ruled that Mary did not overcome the presumption that, as the parent, Seth has a superior right to custody. The court concluded that it was in Alexander's best interest to live with Seth but ordered that Mary retain physical custody of Alexander until the end of the school year. The court denied Mary's motion to reconsider, and this appeal ensued.
Mary's first contention on appeal is that the trial court applied an improper standard when determining who should have custody of Alexander. The court relied on Webb, which involved a guardianship proceeding under the Probate Act, for the proposition that a natural parent has a superior right to custody of a child over a nonparent. Mary contends that the superior right doctrine has no place in a custody determination under the Act and that the court's reliance on Webb was erroneous. Alternatively, she argues that, if Seth's superior right to custody of Alexander was a proper factor to consider, the court placed too much emphasis on that factor.
We begin our analysis by reviewing the applicable statutory provisions. Section 601(b)(2) of the Act (750 ILCS 5/601(b)(2) (West 2000)) provides that a person other than the parent may file a petition for custody of the child in the county in which he permanently resides or is found, but only if he is not in the physical custody of one of his parents. A nonparent does not have "standing" to seek custody of a minor unless the requirements of section 601(b)(2) are met. In re A.W.J., 197 Ill.2d 492, 496-97, 259 Ill.Dec. 392, 758 N.E.2d 800 (2001). In this context, "standing" does not refer to whether a litigant has a justiciable interest in the controversy but, rather, whether the litigant has satisfied the threshold statutory requirements. A.W.J., 197 Ill.2d at 496-97, 259 Ill.Dec. 392, 758 N.E.2d 800.
*678 Once a petitioner has established standing, the next step is to determine the best interest of the minor. Section 602 of the Act (750 ILCS 5/602 (West 2000)) directs courts to consider all relevant factors when determining a child's best interest, including the following:
"(1) the wishes of the child's parent or parents as to his custody;
(2) the wishes of the child as to his custodian;
(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;
(4) the child's adjustment to his home, school and community;
(5) the mental and physical health of all individuals involved;
(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or against another person;
(7) the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, whether directed against the child or directed against another person; and
(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602(a) (West 2000).
In the case at bar, the trial court stated its belief that the superior right doctrine applies in custody determinations regardless of whether the petition is based on the Probate Act or the Act. The court noted Webb's holding that a third party seeking to obtain or retain custody over a natural parent must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody and must further show that awarding custody to the third party would be in the minor's best interest. See Webb, 286 Ill.App.3d at 101, 221 Ill.Dec. 285, 675 N.E.2d 192. Mary maintains that, because section 602 does not indicate that the presumption applies in proceedings brought under the Act, the superior right doctrine has no place in a custody determination under section 602. We disagree.
In In re Custody of Townsend, 86 Ill.2d 502, 56 Ill.Dec. 685, 427 N.E.2d 1231 (1981), the supreme court considered whether the trial court properly awarded custody of a minor to her half-sister instead of to her natural father. The court noted that a parent's right to care for his or her own child is "fundamental and as ancient as mankind" and is "not to be ignored or facilely swept away in the face of a competing petition for custody filed by a third party." Townsend, 86 Ill.2d at 509, 514, 56 Ill.Dec. 685, 427 N.E.2d 1231. Because of the importance of a parent's right to custody, courts in child custody disputes presume that the natural parent's right to the care, custody, and control of a child is superior to that of a third person. Townsend, 86 Ill.2d at 508, 56 Ill.Dec. 685, 427 N.E.2d 1231. A third party seeking custody must show good cause or reason to supersede the parent's superior right and must show that placing custody in the third party is in the minor's best interest. Townsend, 86 Ill.2d at 514, 56 Ill.Dec. 685, 427 N.E.2d 1231. That being said, the parent's right to custody is not absolute and must yield to the best interest of the child. Townsend, 86 Ill.2d at 508, 56 Ill. Dec. 685, 427 N.E.2d 1231. The parent's superior right to custody is one of several factors for the court to consider when determining a child's best interest. Townsend, 86 Ill.2d at 508, 56 Ill.Dec. 685, 427 N.E.2d 1231.
Townsend further instructs that the court "should give weight to the claim *679 of a third person who has had actual or legal custody of the child for a substantial period of time, especially if the evidence shows that the child has become an integral member of a true family unit." Townsend, 86 Ill.2d at 515, 56 Ill.Dec. 685, 427 N.E.2d 1231. This, however, is just one of the best interest factors the court should consider. It does not "rise to the level of a presumption so as to `neutralize' the superior-right doctrine." Townsend, 86 Ill.2d at 515, 56 Ill.Dec. 685, 427 N.E.2d 1231.
Since Townsend was decided, courts have consistently applied its principles to guardianship and custody cases arising under both the Probate Act (Webb, 286 Ill.App.3d 99, 221 Ill.Dec. 285, 675 N.E.2d 192 (1996)) and the Act (In re Marriage of Rudsell, 291 Ill.App.3d 626, 225 Ill.Dec. 736, 684 N.E.2d 421 (1997); In re Custody of Krause, 111 Ill.App.3d 604, 67 Ill.Dec. 408, 444 N.E.2d 644 (1982)). Accordingly, we reject Mary's contention that it was improper for the court to consider Seth's superior right to custody because she sought custody under the Act.
In In re Marriage of Rudsell, 291 Ill. App.3d 626, 225 Ill.Dec. 736, 684 N.E.2d 421 (1997), the court considered whether Chrystal Millage, a friend of the minor's mother who had cared for the two-year-old child since birth, should be given custody over the mother. Millage filed a petition to modify custody under the Act. After determining that Millage had standing under section 601(b)(2) of the Act, the court discussed the determination of a child's best interest. The court in Rudsell applied the superior right doctrine in the same fashion as did the court in Webb, relying on Townsend. Rudsell, 291 Ill. App.3d at 633, 225 Ill.Dec. 736, 684 N.E.2d 421.
Similarly, in Krause, the court applied the superior right doctrine in a custody dispute between a father and a stepfather, brought pursuant to the Act. The child in Krause had been in his mother's custody since his parent's divorce. He lived with his mother, stepfather, and half-sister. The stepfather participated in caring for the child from the time the child was 16 months old. As the child grew older, the stepfather was involved in his education, religious training, and extracurricular activities. The child also maintained a relationship with his father, whom he saw every weekend. When the child's mother died, both the stepfather and the father petitioned for custody of the child. The trial court awarded custody to the father. Krause, 111 Ill.App.3d at 605-06, 67 Ill. Dec. 408, 444 N.E.2d 644.
In reaching its conclusion, the court in Krause noted the applicability of the superior right doctrine, and further noted the well-settled principles that the parent's right serves as only one of several factors for the court to consider and must yield to the best interest of the child. Krause, 111 Ill.App.3d at 606-07, 67 Ill.Dec. 408, 444 N.E.2d 644. Mary has not cited any authority holding that a court may not consider the superior right doctrine when deciding a petition for custody brought under the Act. Although Webb was not directly on point, the principle for which the court cited Webb does apply when determining custody under the Act.
Mary further asserts that section 601(b)(2) of the Act codifies the superior right doctrine and, consequently, there is no need to consider the parent's superior right to custody when determining the child's best interest under section 602. The supreme court has stated that the standing requirement of section 601(b)(2) is designed to ensure that the superior right of natural parents to the care and custody of their children is safeguarded. A.W.J., 197 Ill.2d at 497, 259 Ill.Dec. 392, 758 N.E.2d 800. The court has also stated, *680 though, that in child custody disputes the trial court must consider the presumption in favor of a parent's superior right to custody as one of the factors when determining where the child's best interest lies. Townsend, 86 Ill.2d at 508, 56 Ill.Dec. 685, 427 N.E.2d 1231. Limiting the application of the superior right doctrine to the standing requirement of section 601(b)(2) would contravene Townsend and its progeny. Even though section 602 does not explicitly refer to the presumption, the wishes of the parent is one of the stated factors. See 750 ILCS 5/602(a)(1) (West 2000). Further, Illinois courts have presumed that it is in the best interest of a child to be raised by the natural parent. See Krause, 111 Ill.App.3d at 609, 67 Ill.Dec. 408, 444 N.E.2d 644. Additionally, as Seth points out, adopting Mary's analysis would mean that a nonparent could escape the presumption in favor of the natural parent by seeking custody under the Act instead of the Probate Act. We will not interpret the Act so as to create such an irregular and illogical result.
Mary points to language that parental rights "must yield to the best interest of the child" (see Krause, 111 Ill. App.3d at 606, 67 Ill.Dec. 408, 444 N.E.2d 644) in support of her contention that the superior right doctrine should not be a part of the best interest analysis. While Mary accurately cites the law, we disagree with her interpretation of it. We understand the principle to mean that, when the evidence establishes that the best interest of the child would not be served by awarding custody to the natural parent and would be served by awarding custody to a third person, the court should award custody to the third person regardless of the parent's superior right to custody. In other words, it means that the parent's right to custody is not absolute. It does not mean that the parent's right to custody is excluded from consideration when deciding where a child's best interest lies.
Last, we note that the court in Rudsell addressed this issue and held that "[e]ven if a nonparent is found to have standing and the case is decided under the best interest of the child standard, the court will still give considerable weight to the right of the natural parent." Rudsell, 291 Ill.App.3d at 633, 225 Ill.Dec. 736, 684 N.E.2d 421. Following the supreme court's instruction in Townsend and the analyses of Rudsell and Krause, it is clear that the superior right doctrine, while not controlling, is a relevant factor that a court must consider when deciding a child's best interest as required by section 602 of the Act.
Mary's next contention is that the court's decision to award custody to Seth was against the manifest weight of the evidence because the court placed too much weight on Seth's parental rights. We disagree.
The trial court has wide discretion to determine custody issues because it is in the best position to judge the witnesses' credibility and demeanor and to assess the child's needs. In re Custody of K.P.L., 304 Ill.App.3d 481, 488, 238 Ill.Dec. 78, 710 N.E.2d 875 (1999). We will not disturb the trial court's decision unless it is against the manifest weight of the evidence. K.P.L., 304 Ill.App.3d at 488, 238 Ill.Dec. 78, 710 N.E.2d 875. A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. K.P.L., 304 Ill.App.3d at 488, 238 Ill.Dec. 78, 710 N.E.2d 875.
The court stated that it weighed all of the statutory best interest factors and placed "strong weight" on the first factor, the parent's wishes. We cannot say that the court's decision was against the manifest weight of the evidence because it placed more weight on one factor than *681 another. Section 602 does not require a court to give equal weight to each factor. How much weight a court affords each factor will depend upon the circumstances of each particular case. The wishes of the parent are a proper factor to consider. In addition, the court considered the remaining applicable statutory factors and noted its findings as to each factor.
Like Mary, the stepfather in Krause contended that the court placed too much weight on the superior right doctrine. The appellate court rejected this argument on the ground that the custody award comported with the best interest standard. The court noted that the law presumes that it is in a child's best interest to be raised by his or her natural parent and stated that, "[o]rdinarily, the right of a natural parent will prevail over the claim of a third party where both parties are equally fit." Krause, 111 Ill.App.3d at 609, 67 Ill.Dec. 408, 444 N.E.2d 644.
In the case at bar, no one disputes that Mary took excellent care of Alexander, provided him with a stable home environment when his parents failed to do so, and bore most of the costs of raising him. Nonetheless, Seth has maintained a good relationship with Alexander and, immediately after Patricia died, expressed his desire to bring Alexander to live with him. We cannot say that the trial court's decision to award custody to Seth was unreasonable, arbitrary, or contrary to all of the evidence.
Accordingly, for the reasons stated, we affirm the judgment of the circuit court of Winnebago County.
Affirmed.
GROMETER and KAPALA, JJ., concur.